FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

XIAOYING TANG DOWAI,
*Defendant-Appellant.*

No. 14-10277

D.C. No.
1:13-cr-00014-RVM-1

OPINION

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Ramona V. Manglona, Chief Judge, Presiding

Argued and Submitted June 15, 2016
Honolulu, Hawaii

Filed October 17, 2016

Before: Sidney R. Thomas, Chief Judge, and Consuelo M.
Callahan and Mary H. Murguia, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY*

### Criminal Law

The panel affirmed convictions in a case in which the defendant asserted that she was deprived of her constitutional right to an independent judiciary because the Northern Mariana Islands District Court – which was created by statute and whose judges lack the secure tenure required by Article III of the Constitution – is not properly established under the Constitution.

The panel explained that the language of 48 U.S.C. §§ 1821 and 1822 shows that Congress intentionally created the NMI District Court and gave it criminal jurisdiction over criminal prosecutions; that Congress did so based on the authority conferred on it by Article IV, Section 3, Clause 2 of the Constitution; and that this may well be sufficient to defeat the defendant's heavy burden of showing that Congress exceeded its constitutional bounds.

The panel wrote that the defendant's challenge to the NMI District Court's authority fails completely in light of Supreme Court precedent that has rejected challenges similar to hers.

The panel rejected the defendant's other challenges to her conviction in a memorandum disposition.

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Joseph E. Horey (argued), O'Connor Berman Dotts & Banes, Saipan, Commonwealth of the Northern Mariana Islands, for Defendant-Appellant.

Garth R. Backe (argued) and Ross K. Naughton, Assistant United States Attorneys; Alicia A.G. Limtiaco, United States Attorney; United States Attorney's Office, Saipan, Commonwealth of the Northern Mariana Islands; for Plaintiff-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

Xiaoying Tang Dowai ("Tang"), a native of China, appeals her convictions for visa fraud, making a false statement, and conspiracy to defraud the United States. On appeal, she asserts she has been deprived of her constitutional right to an independent federal judiciary because the Northern Mariana Islands District Court ("NMI District Court") is not properly established under the Constitution. We hold that Tang was properly tried in the NMI District Court and affirm her conviction.[1]

**I**

Tang came to Saipan from China in 2002 and worked in several garment factories. When her employment contract

---

[1] We reject Tang's other challenges to her conviction in a memorandum disposition filed concurrently with this opinion.

expired in 2009, Tang was unable to find another contract employer. In order for Tang to remain in Saipan, her boyfriend, Shahadat Hossain (known as Chico), approached Jesse Dowai, a native of Saipan, and asked him if he would help out by marrying a Chinese woman. Chico told Dowai he would pay him $500. Dowai agreed to the proposition and married Tang in September 2009. Chico was present at the marriage and gave Dowai $500.

Following the marriage ceremony, Tang and Dowai never lived together and never spent any time together in the absence of Chico. Tang's marriage to Dowai made her eligible for an "immediate relative" ("IR") entry permit under Commonwealth of the Northern Mariana Islands ("CNMI") law, pursuant to which she could reside and work on Saipan without a contract. Tang secured work as a cashier in a poker room through November 2011.

At that time there was a change in the law and Tang's IR status no longer allowed her to work. She was advised that if she wanted to keep working she would have to apply for lawful permanent resident status. Accordingly, she applied for a green card. Tang's application asserted that she was married to Dowai and that they had lived together since October 2009.

Tang was initially indicted in October 2013 in the NMI District Court. Her motion to dismiss the indictment on constitutional grounds was denied and a superseding indictment issued on January 21, 2014, charging her with conspiracy to defraud the United States (18 U.S.C. § 371), visa fraud (18 U.S.C. § 1546(a)), and making a false statement (18 U.S.C. § 1001(a)(2)). The jury found Tang guilty on all three charges.

After the NMI District Court denied Tang's post-trial motion for judgment of acquittal and arrest of judgment, she was sentenced to a term of two years' probation.  Tang filed a timely notice of appeal.

## II

Tang's most serious contention on appeal, at least in terms of its potential consequences, is that because the judges of the NMI District Court lack the secure tenure required by Article III of the Constitution, her trial for violations of Title 18 in that court violates Article III.[2]  In support of her position, Tang notes that the NMI District Court is created by statute, 48 U.S.C. § 1821(b), and objects that NMI District Court judges serve ten-year terms and can be removed by the President alone.

The constitutionality of a statute is a question of law that we review de novo.  *United States v. Godinez-Ortiz*, 563 F.3d 1022, 1032 (9th Cir. 2009); *United States v. Harris*, 185 F.3d 999, 1003 (9th Cir. 1999).  However, Tang has the considerable burden of making a plain showing that Congress exceeded its constitutional bounds in creating the NMI District Court.  *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").

Tang is correct that the NMI District Court is not an Article III court and its judges are not Article III judges.

---

[2] Tang does not allege that being tried in the NMI District Court otherwise violated any of her constitutional rights.

Indeed, the Supreme Court in *Nguyen v. United States*, 539 U.S. 69, 72–73 (2003), stated that the NMI District Court "is not an Article III court but an Article IV territorial court with subject matter substantially similar to the jurisdiction of the District Court of Guam." But it does not follow that the NMI District Court lacked authority to try Tang.

### A. The NMI District Court was established by Congress pursuant to its authority under Article IV of the Constitution.

Despite the Supreme Court's statement, Tang asserts that the NMI District Court is not a territorial court created pursuant to Congress' authority under Article IV of the Constitution, but an Article I treaty court. Tang explains that Article II of the Constitution gives the President the power to make treaties, and the terms of a treaty are implemented by Congress under its Article I powers, including its power under the Necessary and Proper Clause and its power to "constitute Tribunals inferior to the supreme Court." *See Missouri v. Holland*, 252 U.S. 416, 432 (1920). Article IV, Section 3 of the Constitution grants Congress the power "to dispose of and make all needful rules and regulations respecting the territory or *other property belonging* to the United States." (emphasis added).

We have recognized the "unique political relationship between the [Northern Mariana Islands] and the United States." *Com. of N. Mariana Islands v. Atalig*, 723 F.2d 682, 684 (9th Cir. 1984). From 1947 until 1975, the United States exercised "powers of administration, legislation, and jurisdiction" over the CNMI under a United Nations Trusteeship. *Id.* However, in 1975, the people of the CNMI

chose to become a self-governing commonwealth under United States sovereignty. *Id*. at 685.

Whatever the initial authority for the United States exercising authority over the CNMI, the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States, coupled with Congress' approval of the Covenant in Joint Resolution of March 24, 1976 (Pub. L. No. 94-241, 90 Stat. 263, *reprinted in* 48 U.S.C. § 1681), established Congress' authority over the CNMI under Article IV of the Constitution. The Covenant states that the people of the CNMI, exercising "their inalienable right of self-determination, . . . have clearly expressed their desire for political union with the United States."[3] The United States, in return, while recognizing that the people of the CNMI "have the right of local self-government," agreed to "have complete responsibility for and

---

[3] Section 105 of the Covenant further states:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I II and III and Section 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

*Reprinted in* Pub. L. 94-241, 90 Stat. 263 (1976). Title 48 U.S.C. § 1821 specifically names the CNMI as required by Section 105.

authority with respect to matters relating to foreign affairs and defense affecting the Northern Mariana Islands." Pub. L. No. 94-241 (Sections 103 and 104).

In conjunction with the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Congress, in November 1977, passed legislation that has been codified in Title 48 U.S.C. § 1821. *See* Pub. L. 95-157, 91 Stat. 1265 (1977). Title 48 U.S.C. § 1821(a) establishes "for and within the Northern Mariana Islands a court of record to be known as the District Court for the Northern Mariana Islands." Subsection (b) provides for the President to appoint, with the advice and consent of the Senate, a judge for the NMI District Court "who shall hold office for a term of ten years and until his successor is chosen and qualified, unless sooner removed by the President for cause." Section 1822 states that:

> The district court shall have original jurisdiction in all causes in the Northern Mariana Islands not described in subsection (a) of this section jurisdiction over which is not vested by the Constitution or laws of the Northern Mariana Islands in a court or courts of the Northern Mariana Islands.

Moreover, Congress clearly intended that the NMI District Court have jurisdiction over criminal cases as the legislation provided that "[i]n causes brought in the district court solely on the basis of this subsection, the district court shall be considered a court of the Northern Mariana Islands for the purposes of determining the requirements of indictment by grand jury or trial by jury." *See id*.

The language of 48 U.S.C. §§ 1821 and 1822 clearly shows that Congress intentionally created the NMI District Court and gave it jurisdiction over criminal prosecutions. Congress did so based on the authority conferred on it by Article IV, Section 3, Clause 2 of the Constitution.[4] This, indeed, may well be sufficient in itself to defeat Tang's heavy burden of showing that Congress "exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607.[5] However, Tang's challenge to the NMI District Court's authority fails completely in light of Supreme Court precedent that has rejected challenges similar to hers.

---

[4] None of the cases cited by Tang compels a different conclusion. In *Atalig*, we implied that Congress administers the CNMI under Article IV. 723 F.2d at 689 (noting that the doctrine of incorporation "is designed to limit the power of Congress to administer territories under Article VI of the Constitution"). In *Ngiraingas v. Sanchez*, 858 F.2d 1369, 1371 n.1. (9th Cir. 1988), we noted that the "CNMI has a unique relationship with the United States" and commented on the relationship under the Trusteeship, but not under the Joint Resolution. In *Morgan Guaranty Trust Co. v. Republic of Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991), the Second Circuit, after describing the unique nature of a trust territory, took "judicial notice of the fact that the United Nations Security Council has approved the termination of the trusteeship arrangement as to the Northern Mariana Islands, which has acquired the status of commonwealth."

[5] Moreover, Tang has failed to show that it makes any difference whether Congress' creation of the NMI District Court derives from its authority under Article IV or Article I of the Constitution. The grounds for holding that the NMI District Court has authority to convict Tang as an Article IV court also support its authority to convict Tang as an Article I court.

**B. The Supreme Court has rejected similar challenges to non-Article III courts**.

In *Palmore v. United States*, 411 U.S. 389 (1973), Palmore challenged his conviction of a felony under the District of Columbia Code because the District of Columbia judge did "not have protection with respect to tenure and salary under Art. III of the Constitution." *Id*. at 390. Writing for the Court, Justice White described Palmore's position as being "that an Art. III judge must preside over every proceeding in which a charge, claim or defense is based on an Act of Congress or a law made under its authority." *Id*. at 400. "At the very least, [Palmore] asserts that criminal offenses under the laws passed by Congress may not be prosecuted except in courts established pursuant to Art. III." *Id*. This is precisely Tang's position.

But the Supreme Court was not impressed. It held that Congress "was not constitutionally required to create inferior Art. III courts to hear and decide cases within the judicial power of the United States, including those criminal cases arising under the laws of the United States."[6] *Id*. at 401. The

---

[6] The Supreme Court continued:

> Nor, if inferior federal courts were created, was it required to invest them with all the jurisdiction it was authorized to bestow under Art. III. "[T]he judicial power of the United States . . . is (except in enumerated instances, applicable exclusively to this court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) . . . and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding

Court further commented "[n]or, more particularly has the enforcement of federal criminal law been deemed the exclusive province of federal Art. III courts." *Id*. at 402. The Supreme Court then specifically addressed Article IV courts:

> It is also true that throughout our history, Congress has exercised its power under Art. IV to 'make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States' by creating territorial courts and manning them with judges appointed for a term of years. These courts have not been deemed subject to the strictures of Art. III, even though they characteristically enforced not only the civil and criminal laws of Congress applicable throughout the United States, but also the laws applicable only within the boundaries of the particular territory.

*Id*. at 402–03. The Court noted that "[t]erritorial courts, therefore, have regularly tried criminal cases arising under the general laws of Congress, as well as those brought under territorial laws." *Id*. at 403 (footnotes omitted).

In the final section of its opinion, the Supreme Court reiterated that neither it nor Congress had read the

---

> jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Cary v. Curtis*, 3 How. 236, 245, 11 L.Ed. 576 (1845).

411 U.S. at 401.

Constitution to require "every criminal prosecution . . . to be tried in an Art. III court before a judge enjoying lifetime tenure and protection against salary reduction." *Id*. at 407. Rather, the requirements of Art. III "must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment." *Id.* at 408.

### C. Tang's challenge to the NMI District Court misreads Supreme Court precedent.

In response to this approach, Tang argues that Article IV does not apply because the "CNMI is not so remote and its relation to the United States is not so impermanent that an exception to the requirements of Article III is justified." She appears to extract this suggested limitation on Congressional authority under Article IV from an observation in Justice Harlan's opinion in *Glidden v. Zdanok*, 370 U.S. 530 (1962), and possibly *O'Donoghue v. United States*, 289 U.S. 516 (1933). However, this argument fails for three reasons. First, Justice Harlan's opinion was not an opinion joined by a majority of the justices.[7] Second, *Glidden* precedes and thus is superseded by *Palmore*, 411 U.S. 389, which, as noted, expressly affirms Congress' authority to create and maintain Article IV courts. Third, and dispositive, the Court in *Glidden* was concerned with defining an Article III court, not with limiting the authority of an Article IV court.

---

[7] Only Justices Brennan and Stewart joined Justice Harlan's opinion. Justice Clark wrote a concurring opinion which was joined by Chief Justice Warren. Justice Douglas wrote a dissent that was joined by Justice Black. Justice Frankfurter and Justice White took no part in the decision in the case.

The issue in *Glidden* was whether the United States Court of Customs and Patent Appeals and the United States Court of Claims were Article III courts or "had been created by virtue of other substantive powers possessed by Congress." *Glidden*, 370 U.S. at 531. The Court held that the courts were created under Article III and that their judges "have been constitutionally protected in tenure and compensation." *Id.* at 584. In reaching this conclusion, Justice Harlan noted that Congress had declared that the courts were Article III courts.[8] *Id.* at 540–43.

In the course of his opinion, Justice Harlan endorsed Chief Justice Marshall's opinion in *American Insurance Company v. Canter*, 1 Pet. 511, 7 L. Ed. 242 (1828). In *Canter*, the Court rejected a challenge to the Superior Courts of Florida based on the fact that their judges were appointed for only four years. The Court concluded that Article III did not apply in the territories because they were "legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." 1 Pet. at 546. In *Glidden*, Justice Harlan explained that Chief Justice Marshall's opinion established "that in the territories cases and controversies falling within the enumeration of Article III may be heard and decided in courts constituted without regard to the limitations of that article; that is, having judges of limited tenure and entertaining

---

[8] Justices Clark and Douglas agreed that the Court of Claims and the Court of Customs and Patent Appeals were Article III courts. 370 U.S. at 586–87.

business beyond the range of conventional cases and controversies." *Glidden*, 370 U.S. at 545.[9]

Justice Harlan noted that "Article III has been viewed as inapplicable to courts created in unincorporated territories outside the mainland" as well as "to the consular courts established by concessions from foreign countries." *Id*. at 547. While discussing these courts, Justice Harlan did observe that when "the peculiar reasons justifying investiture of judges with limited tenure have not been present, the *Canter* holding has not been deemed controlling." *Id.* at 548 (citing *O'Donoghue*, 289 U.S. at 536–39). However, this observation was made in support of the determination that the Court of Claims and Court of Custom and Patent Appeals were Article III courts. In context, Justice Harlan's observation cannot be read as suggesting that the authority of a non-Article III court established by Congress might somehow erode with the passage of time or because of changes in the local setting. Indeed, in *Glidden*, Justice

---

[9] Justice Harlan further noted:

> It would have been doctrinaire in the extreme to deny the right of Congress to invest judges of its creation with authority to dispose of the judicial business of the territories. It would have been at least as dogmatic, having recognized the right, to fasten on those judges a guarantee of tenure that Congress could not put to use and that the exigencies of the territories did not require. Marshall chose neither course; conscious as ever of his responsibility to see the Constitution work, he recognized a greater flexibility in Congress to deal with problems arising outside the normal context of a federal system.

370 U.S. at 546–47.

Harlan noted that it was not necessary to "explore the extent to which Congress may commit the execution of even 'inherently' judicial business to tribunals other than Article III courts." *Id.* at 549. Thus, *Glidden* offers no support for Tang's suggestion that an Article IV court may somehow, over the passage of time, lose its authority.

*O'Donoghue*, like *Glidden*, was concerned with defining an Article III court, not with limiting the authority of an Article IV court, and thus does not apply to the NMI District Court. *O'Donoghue* addressed an effort by Congress to reduce the salary of the judges of the Court of Appeals and the Supreme Court of the District of Columbia. *O'Donoghue*, 289 U.S. at 525. The Court held that the judges had been appointed under Article III of the Constitution and therefore their remuneration could not be diminished. In doing so, the Court took pains to distinguish the District of Columbia from territories of the United States, noting that Congress' authority over the District is set forth in a separate clause of the Constitution (Article 1, section 8, clause 17), and that the District "is as lasting as the states from which it was carved or the union whose permanent capital it became." *Id*. at 538. Here, there is no contention that the judges of the NMI District Court are Article III judges. Rather, Tang's contention is that because the judges of the NMI District Court are not Article III judges—serving for good behavior and without diminution of compensation—the NMI District Court lacks jurisdiction to try her. However, as noted, the Supreme Court rejected such an argument in *Palmore*, 411 U.S. at 401–02, which, having been decided some forty years after *O'Donoghue*, implicitly limits the Court's prior opinion.

Even if *O'Donoghue* or *Glidden* were read to suggest that contingencies or the passage of time might somehow affect the authority of an Article IV court, there has been no change with regard to the NMI District Court.  Indeed, *O'Donoghue* seems to envision that the operative change is becoming a state.  289 U.S. at 537.  However, the CNMI's relationship with the United States continues to evolve and the CNMI remains geographically remote.  Despite the fact that the United States has exercised control over the CNMI since World War II, the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America was not approved until 1976.  We know of nothing subsequent that might have eroded the authority of the NMI District Court.

**D. Nothing in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833 (1986), undermines the authority of the NMI District Court.**

Our recognition of the NMI District Court as a non-Article III court does not implicate the concerns expressed by the Supreme Court in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833 (1986).  There, in holding that Congress could constitutionally give the Commodity Futures Trading Commission authority to adjudicate state law counterclaims in reparation proceedings, the Court set forth the broad standard that "the constitutionality of a given congressional delegation of adjudicative functions to a non-Article III body must be assessed by reference to the purposes underlying the requirements of Article III" and this inquiry "is guided by the principle that 'practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.'"  *Id.* at

847–48 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985)).

*Schor* concerned legislation that gave an agency authority over matters that would otherwise have been adjudicated in state court or an Article III court. Here, however, we address Congress' creation of a United States judicial forum where none had previously existed. As noted, Congress' authority to do so is clearly set forth in Article IV. Moreover, there is no danger of encroachment on the judicial power by the executive or legislative branch, *see* 478 U.S. at 853–54, as decisions by the NMI District Court are reviewed by the United States Court of Appeals for the Ninth Circuit, an Article III court. Furthermore, we note that in *Schor*, the Supreme Court rejected Schor's "novel theory" that "Article III should be read to absolutely preclude any adjudication of state law claims by federal decisionmakers that do not enjoy the Article III salary and tenure protections." *Id*. at 858. In sum, the creation of the NMI District Court as a non-Article III court is "purposed" by Article IV of the Constitution and Tang has not shown that any constitutional interest has been improperly infringed by it exercising jurisdiction over her criminal trial.

## III

In *Nguyen*, 539 U.S. at 72–73, the Supreme Court stated that the NMI District Court "is not an Article III court but an Article IV territorial court." In light of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States, coupled with Congress' approval of the Covenant in Joint Resolution of March 24, 1976, we agree. Reviewing the guidance provided by the Supreme Court in *Palmore* and *Glidden*, we affirm

what we previously stated in an unpublished memorandum: the NMI District Court was properly established by Congress under Article IV and is empowered to hear federal criminal cases. *See United States v. Wei Qin Sun*, 399 F. App'x 319, 320 (9th Cir. 2010) (unpublished).

Accordingly, we reject Tang's challenge to the authority of the NMI District Court to try her for violations of United States Code Title 18. In conjunction with our concurrently filed memorandum disposition, Tang's conviction is **AFFIRMED**.